## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| SOLUTION TECHNOLOGY INTERNATIONAL, INC., | Case No. 08-_____ (   ) (Jointly Administered) |
| Debtor. | |

## AFFIDAVIT OF DAN L. JONSON, CHIEF EXECUTIVE OFFICER OF SOLUTION TECHNOLOGY INTERNATIONAL, INC., IN SUPPORT OF FIRST DAY MOTIONS

| | |
|---|---|
| STATE OF MARYLAND | )  |
| | ) ss: |
| COUNTY OF GARRETT | ) |

Dan L. Jonson, being duly sworn, states that the following is true to the best of his knowledge, information, and belief:

1.      I am the President and Chief Executive Officer of Solution Technology International, Inc. ("**STI**" or the "**Debtor**").

2.      Since February 1, 1999, I have served as the President and Chief Executive Officer of STI.

3.      I have reviewed, worked with, and have knowledge of the Debtor's books and records, including its current and historical financial statements, projections, business plans, business analyses and reports, certain contracts and certain other legal documents, notes and correspondence and the like. I also have participated directly in discussions and negotiations with the Debtor's lenders, vendors, and worked closely with the Debtor's personnel that handle the Debtor's business operations and financial management, as well as with the Debtor's counsel in respect of these matters.

4.      I submit this affidavit (the "**Affidavit**") in support of the Debtor's Chapter 11

petition and the first day applications and motions filed in the above-captioned case.  Except as

otherwise indicated herein, all facts set forth in this Affidavit are based on my personal

knowledge, my discussions with other members of the Debtor's management, my review of

relevant documents, and/or my opinion, relying on my experience in the industry and knowledge

of the Debtor's operations and financial condition.  If I were called upon to testify, I could and

would testify competently to the facts set forth herein.  I am authorized to submit this Affidavit.

5.      This Affidavit describes the Debtor's business and the circumstances surrounding

the commencement of this Chapter 11 case.  Also, in this Affidavit I attest to the truth and

accuracy of the relevant facts set forth in the First Day Pleadings (as hereinafter defined) filed

concurrently herewith.  I have concluded that that the relief requested in the First Day Pleadings

is in the best interests of the Debtor, its creditors and estate, and therefore respectfully request

that the Court grant the requested relief.

### Background

**A.      The Chapter 11 Filing**

6.      On November 4, 2008, (the "**Petition Date**"), the Debtor filed a voluntary petition

for relief under Chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as

amended, the "**Bankruptcy Code**").

7.      The Debtor continues to operate its business and manage its property as debtor-in-

possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

8.      No trustee or examiner has been appointed in this Chapter 11 case.

9.      The Debtor commenced this Chapter 11 case in order to obtain the financial

flexibility to commence a sales and marketing effort of its software products.

10.     The Debtor will pursue its plan of reorganization in a quick and orderly manner

2

and ensure that it preserves the value of its assets and maximize the available recovery to its stakeholders. The Debtor remains optimistic that with additional needed resources it can reorganize its business.

11.    While the Debtor is pursuing its options in Chapter 11, it is imperative that it maintain employee and other relationships to ensure that the value of its estate is maximized.

**B.    History and Business of the Debtor**

12.    STI is a Delaware corporation, formed in 1993.[1]

13.    STI is a software company that has developed a product named SurSITE.® SurSITE provides accurate, real time financial information to management of insurance and reinsurance companies. The market for SurSITE is significant: 6,500 primary providers of insurers and reinsurers and 4,500 captive insurers that generate $2.5 trillion dollars globally.[2]

14.    With SurSITE, insurance and reinsurance companies have the ability to identify their financial exposure by line of business and to accelerate recovery from reinsurance contracts for insurable events. For example, the insurance industry was unaware of the number of insurance policies that provided coverage as either an insurer or reinsurer in connection with the World Trade Center tragedy. Consequently, after the events of 9/11, the insurance industry became aware of the lack of insight that it had regarding its financial exposure for insurable events, a lesson also learned in connection with Hurricane Katrina in 2006.

15.    Currently, it takes an insurance company 45-60 days to determine its risk exposure through analysis of its various lines of business when a major catastrophic event takes

---

[1] STI was originally incorporated as Dan L. Jonson Associates, Inc. On June 22, 1994 it changed its name to Solution Technology International, Inc.

[2] Annual IT budgets worldwide are $75 billion and in the United States alone are $42 billion.

place. SurSITE fills this information gap by automating back office functions to bring 21st century technology to 19th century processes through a complete end-to-end technical accounting environment for the global insurance and reinsurance industry, including insurers, reinsurers, large insurance groups, captive insurance companies, pools and Managing General Agencies. SurSITE consists of a robust framework of Web-enabled multi-language, multi-currency functional business and processing servers.

16.     SurSITE was built by STI in partnership with a European charter client, the Swiss Pool for Aviation Insurance ("**SPL**").  SPL is a consortium currently consisting of 16 major European insurance and reinsurance companies.  During the development and implementation phase at SPL, numerous alpha and beta versions were deployed, tested and run by SPL, Swiss Re and Aon professional staff.  The initial production version at SPL was v1.23.  During subsequent meetings and system demonstrations at potential clients in the U.S. and overseas, the system has constantly been upgraded to stay competitive.  Current production version, v2.6, is ready to be deployed to an insurance group with multiple business units and/or subsidiaries writing high-capacity lines of business that utilizes complex reinsurance programs.

**C.     Background of the Chapter 11 Filing**

17.     To finance its operations, STI obtained certain funds from SPL while working with SPL on the development and deployment of a beta version of SurSITE.  The growth and further development of its software required several million dollars.  In January 10, 2003, STI obtained bridge financing in the principal amount of $750,000 through a loan from CrossHill Georgetown Capital ("**CrossHill**") that was secured by a blanket lien against all STI's assets. This bridge loan was issued in connection with an anticipated venture financing of $3 million for which STI obtained term sheets from some venture capital firms.  However, in light of the poor

economic climate at that time for the venture firms, one of the two had to withdraw from the group, which collapsed that financing opportunity.

18.    In June 2004, STI entered into an equity financing agreement with YA Global Investments, L.P. (f/k/a Cornell Capital Partners, LP) ("**YA Global**") where YA Global committed to purchase from STI up to $12 million dollars of STI's common stock as outlined in a Standby Equity Distribution Agreement ("**SEDA**").  Under the terms of the SEDA, STI had to become a publicly traded OTCBB company and to provide a blanket lien against its assets. Accordingly, CrossHill and YA Global entered into an intercreditor agreement to allow them to coordinate any sale of assets to satisfy their respective loans to STI.  STI spent several months attempting to become a public company when the U.S. Securities and Exchange Commission (the "**SEC**") determined that YA Global's going public strategy for STI--using an existing portfolio company of YA Global to distribute STI's shares to that portfolio company's shareholders--would not be allowed.  By this time, STI had spent $600,000 advanced by YA Global in attempting to go public and for overhead expenses during the SEC registration process.

19.    Needing access to the $12 million SEDA, STI agreed on June 20, 2005 to a reverse merger with a troubled OTCBB portfolio company of YA Global, NetWorth Technologies.  Pursuant to the merger, STI assumed existing debt of approximately $1.2 million in the form of convertible debentures owed by NetWorth Technologies to YA Global.  In the merger, NetWorth Technologies issued shares equal to 90% of its outstanding shares for 100% of the outstanding shares of STI.  On June 23, 2006, STI filed a definitive Form 14C with the SEC on behalf of NetWorth Technologies, which concluded the major portion of the reverse merger.  In October 2006, STI finalized the process and became a publicly traded company trading on the OTCBB under the symbol STNL.  The SEDA was cancelled by YA Global in

5

2006 for regulatory reasons and instead STI issued convertible debentures to YA Global in return

for total funding to date of $1,850,000, not including the debt STI assumed when it merged with

NetWorth Technologies. YA Global required STI to register the shares underlying the

convertible debentures.

20.     In 2006, STI started to accelerate its sales effort and to enhance its software, but

could not obtain sufficient financing from YA Global. With scarce financial resources, STI

could not employ a sales team nor engage an investor relations ("**IR**") or public relations ("**PR**")

firm to provide the level of support to keep its shares priced sufficiently high to counter the

downward pressure on its share price as YA Global converted debt under the STI convertible

debentures to repay the principal and interest owed to YA Global, including the amounts

assumed from NetWorth Technologies. Since the convertible debentures had floating conversion

rates, *i.e.*, a discount off the current bid price of STI's shares on the OTCBB, as STI's share price

started to fall more and more shares had to be issued to meet the conversion demands of YA

Global.

21.     STI determined that the only way it could survive was to find an investor that was

willing to purchase the secured debt that was owed to YA Global and CrossHill.

22.     In late 2007, STI met the principals of Resurgence Partners, LLC. Following

their due diligence investigation of STI, Resurgence Partners decided to finance STI through an

investment of $2.5 million. The investment was to be funded in three tranches: The first $1.01

million was used to acquire the outstanding convertible debentures of YA Global[3] and the debt

of CrossHill. The second tranche is intended to provide postpetition secured financing (the "**DIP**

**Financing**") in this Chapter 11 case to support STI through the end of the Chapter 11 case. The

---

[3] YA Global was allowed to keep a subordinated secured debt of $150,000.

6

final tranche that is expected to be not less than $1 million is intended as exit financing to provide working capital to allow STI to make its first sales and support its stock price through engagement of PR and IR firms.

**D.     The Debtor's Prepetition Secured Obligations**

23.     Prior to the Petition Date, STI entered into a series of debt and equity financing agreements with YA Global Investments, L.P. (f/k/a Cornell Capital Partners, LP) ("**YA Global**") secured by a blanket lien against all of STI's assets (the "**Secured Financing Agreements**").  Those Secured Financing Agreements have now been assigned to Resurgence Partners (except that $150,000 of those obligations are still held by YA Global as a subordinated claim to the first priority secured lien held by Resurgence Partners).  The Secured Financing Agreements that YA Global assigned to Resurgence Partners are as follows:

A.     *Secured Convertible Debenture.* In April, 2006, STI entered into a secured convertible debenture in the amount of $1 million dated April 4, 2006 and due April 4, 2008 (the "**Secured Convertible Debenture**").  The Secured Convertible Debenture carries an interest rate of 8%.  STI has an option to redeem a portion or all amounts outstanding under the Secured Convertible Debenture upon three days advance written notice provided that the closing bid price of the STI's common stock is less than $.75.  This Secured Convertible Debenture has expired, but no default has been noticed or taken.

Under the terms of the Secured Convertible Debenture so long as any principal amount or interest is owed, STI cannot, without the prior consent of Resurgence Partners (i) issue or sell any common or preferred stock with or without consideration, (ii) issue or sell any preferred stock, warrant, option, right, contract or other security or instrument granting the holder thereof the right to acquire common stock with or without consideration, (iii) enter into any security

7

instrument granting the holder of security interest in any of STI's assets or (iv) file any registration statement on Form S-8. Under the terms of the Secured Convertible Debenture there are a series of events of default, including failure to pay principal and interest when due, STI's common stock ceasing to be quoted for trading or listing on the OTCBB and shall not again be quoted or listed for trading within five trading days of such listing, or STI being in default of any other debentures that have been assigned to Resurgence Partners.

    B.    *Amended and Restated Convertible Compensation Debenture.* STI entered into an amended and restated convertible compensation debenture in the amount of $400,000 due April 4, 2008 (the "**Compensation Debenture**"). The purpose of the Compensation Debenture was to pay a fee in connection with the now terminated SEDA. This Compensation Debenture has similar redemption, conversion and remedies upon an event of default as the Secured Convertible Debenture.

    C.    *Second Amended and Restated Secured Convertible Debenture.* STI entered into a second amended and restated convertible debenture in the principal amount of $642,041 dated April 4, 2006 (the "**Second Amended Debenture**"). Interest payments are to be paid monthly in arrears commencing April 4, 2008 and continuing for the first day of each calendar month thereafter that any amounts due under the convertible debenture are due and payable. The interest includes a redemption premium of 20% in addition to interest set at an annual rate of 8%.

    24.    The Secured Financing Agreements also include convertible debentures dated April 4, 2006 and November 24, 2004 in the principal amounts of $256,757 and $625,000, respectively.

**E.    The Debtor's Prepetition Equity Structure**

    25.    STI has 179,358,604 shares of common stock issued and outstanding held by

8

approximately 200 shareholders of record and an undisclosed number of beneficial owners

holding shares of STI common stock in street name.  STI also has 801,831 shares of Series A

preferred stock outstanding ("**Class A Preferred Stock**").

26.    The holders of shares of the Class A Preferred Stock will be entitled to all

dividends declared by the Board of Directors at a rate per share 10 times that paid per share of

common stock, and will be entitled to convert each share of Class A Preferred Stock for 100

shares of common stock (subject to adjustment upon the occurrence of certain events as specified

in the Certificate of Designation), but only to the extent that the aggregate number of shares of

common stock held by the holder (and any other person with whom the holder must aggregate

shares for purposes of Commission Rule 144) is less than 5% of the Company's outstanding

common stock so that the holder will not be deemed to have "control" within the meaning of

Commission Rule 405.

27.    The Certificate of Designation further provides: (1) for liquidation rights that treat

one share of Class A Preferred Stock as if it were 1,000 shares of common stock in the event of

the liquidation, dissolution or winding up of the Company; (2) that the Class A Preferred Stock

will have no voting rights; and (3) that no holder of Class A Preferred Stock may serve as an

officer or director of STI, or serve in any capacity with the Company that would render such

person a "control person" within the meaning of the Securities Exchange Act.  There are

warrants to purchase 11,888,912 shares of the STI's common stock outstanding at exercise prices

ranging from $0.15 and $0.0022 per share.

**F.**    **Debtor-in-Possession Financing**

28.    DIP financing in the estimated sum of $783,000 will be provided by Resurgence

Partners, pursuant to an Agreement for DIP Financing attached hereto as **Exhibit 1** (the "**DIP**

**Financing Agreement**").

29.    STI and Resurgence Partners have engaged in good faith and arms-length negotiations that culminated in an agreement by Resurgence Partners to provide the Debtor with up to $783,000 of secured postpetition financing, on the terms and subject to the conditions set forth in the DIP Financing Motion, filed contemporaneously herewith and incorporated herein by reference.

30.    The Debtor is seeking the debtor-in-possession financing and use of cash collateral on an emergency basis in light of the immediate and irreparable harm that will be suffered by the Debtor's estate if the relief sought in the DIP Financing Motion is not granted.

31.    The Debtor has an urgent need to obtain the funds available under the DIP Financing Agreement in order to, among other things, (i) satisfy working capital and operational needs, (ii) continue to fund payroll, and (iii) maintain its relationships with customers and certain vendors and suppliers.

32.    STI expects to emerge from the Chapter 11 case as quickly as possible following confirmation of its plan of reorganization.

**G.    The First Day Motions and Applications**

33.    On the Petition Date and in connection with its bankruptcy case, the Debtor has filed the following motions and applications (collectively, the "**First Day Pleadings**"),[4] among other pleadings:

- Debtor's Application for Entry of Order Authorizing the Retention and Employment of Seyfarth Shaw LLP as Counsel for the Debtor *Nunc Pro Tunc* As of the Petition Date (the "**Seyfarth Shaw Retention Application**");

---

[4] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the applicable First Day Pleading.

- Debtor's Motion for Entry of An Administrative Order Under 11 U.S.C. §§105 and 331 Establishing Procedures for Interim Monthly Compensation and Reimbursement of Expenses of Professionals;

- Debtor's Motion for Entry of An Order Authorizing Continued Use of Existing Bank Accounts, Business Forms and Cash Management System (the "**Cash Management Motion**");

- Debtor's Motion for Interim and Final Orders Authorizing the Debtor to Obtain Postpetition Secured Financing Pursuant to Sections 105, 362, 364(c) and 364(e) of the Bankruptcy Code (the "**DIP Financing Motion**"); and

34.     I have reviewed each of the Debtor's First Day Pleadings (including any exhibits thereto) and can attest to the veracity of the facts set forth therein. Additionally, I believe that the relief sought in each First Day Pleading (a) is necessary to enable the Debtor to operate in Chapter 11 with a minimum of disruption to its business or loss of productivity or value, and (b) constitutes a critical element in maintaining the Debtor's going concern value pending the confirmation of a plan. Factual information in support of the First Day Pleadings is provided below and in the applications and motions filed concurrently herewith.

## **Retention Applications**

### **Seyfarth Shaw Retention Application**

35.     By the Seyfarth Shaw Retention Application, the Debtor respectfully requests that the Court enter an order authorizing it to employ and retain Seyfarth Shaw as its counsel in this case as of the Petition Date.

36.     Counsel is experienced in matters of this nature and has the resources to handle this case. Seyfarth Shaw is a full-service law firm with more than 750 attorneys in 10 offices. The members of the firm practice in almost every practice area, including bankruptcy, workouts, litigation, business, and commercial law.

37.     Prior to the Petition Date, the Debtor employed Seyfarth Shaw to advise and provide legal services in connection with its current restructuring efforts.  This representation included, but was not limited to, consultation with respect to the restructuring of the Debtor's business and negotiations with its secured lenders, and the preparation of the legal documentation necessary to file this Chapter 11 case.

38.     In providing such prepetition services to the Debtor, Seyfarth Shaw professionals worked closely with the Debtor's management and have become well-acquainted with the Debtor's business operations, financial condition, debt structure and related matters.  Seyfarth Shaw thereby developed relevant experience and expertise regarding the Debtor's business that will assist it in providing effective and efficient services in this Chapter 11 case.  Accordingly, the Debtor believes that Seyfarth Shaw is both well-qualified and uniquely able to represent it in this case.

39.     Additionally, the Debtor will seek to retain employ and retain Greenberg Traurig LLP ("**Greenberg Traurig**") as its local counsel in this case as of the Petition Date.

40.     The Debtor submits that it is necessary and efficient for the Debtor to employ co-counsel in this case.  Pursuant to Rule 83.5(d) and (e) of the Local Rules of Civil Practice and Procedure of the United States District Court for the District of Delaware (the "**Local District Court Rules**") and Local Rule 9010-1(c), the Debtor is required to retain local Delaware counsel.  Seyfarth Shaw and Greenberg Traurig have assured the Debtor that they will make every effort to avoid and/or minimize duplication of services in this case.

41.     The Debtor will seek to retain Greenberg Traurig as its local counsel because of the firm's extensive general experience and knowledge in the field of debtor's and creditor's rights and business reorganizations under chapter 11 of the Bankruptcy Code.  Moreover,

Greenberg Traurig is well suited for the type of representation required by the Debtor. Greenberg Traurig maintains an office for the practice of law in Wilmington, Delaware, where this case is pending and has extensive experience appearing before the Courts in this District. In addition, Greenberg Traurig has substantial experience representing debtors in complex reorganization cases. Greenberg Traurig is an international law firm with more than 1,700 attorneys in 29 offices. The members of the firm practice in almost every practice area, including bankruptcy, workouts, litigation, business and commercial law.

42.    Accordingly, the Debtor determined that Greenberg Traurig has the resources and experience necessary to represent it in this case. Furthermore, Greenberg Traurig has become familiar with the Debtor's business and operations and many of the legal issues that may arise in the context of this case. Thus, the Debtor desires that Greenberg Traurig represent it in as local counsel in this cases.

43.    I believe, therefore, that the relief requested is necessary and appropriate and is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest.

### First Day Motions Pertaining to Business Operations

### Cash Management Motion

44.    By the Cash Management Motion, the Debtor seeks authorization to continue to use its existing cash management system, bank account and business forms and a waiver of certain operating guidelines relating to bank accounts set forth in the operating guidelines for Chapter 11 debtors (the "**Guidelines**") issued by the Office of the United States Trustee (the "**U.S. Trustee**"). The relief requested in the Cash Management Motion will help ensure that the Debtor's transition into chapter 11 will not be hindered by unnecessary disruptions in cash flow or administrative delays that may prevent the Debtor from focusing on the reorganization

process.

45.    The Debtor has one single operating checking account, account no. 2042xxxx, in

the name of Solution Technology International, Inc. at New Windsor State Bank, 213 Main

Street, P.O. Box 489, New Windsor, Maryland (the "**Bank Account**").

46.    The Debtor, in the ordinary course of its business, receives checks, cash, wire

transfers, Automated Clearing House ("**ACH**") transfers, credit/debit card receipts, and

Telecheck payments. All of the Debtor's receipts are deposited into the Bank Account and all of

the Debtor's expenses, including payroll, are paid out of the Bank Account.

47.    The Debtor uses Peachtree Accounting Software to manage its finances and to

keep its books and financial records.

48.    The Debtor believes that their transition into chapter 11 will be significantly less

disruptive to its business if the Bank Account is maintained with the same account number

following the commencement of this case. Payroll, which is funded through the Bank Account,

would be disrupted by a closing of the Bank Account. By preserving this continuity and

avoiding the disruption and delay to the Debtor's payroll and other business activities that would

necessarily result from closing the Bank Account and opening new accounts, all parties in

interest, including the employees, vendors and customers, will be best served.

49.    The Debtor requests authority to designate, maintain and continue to use its

existing Bank Account in the name and the account numbers existing immediately prior to the

Petition Date. (The Debtor specifically reserves the right to close the Bank Account and open

new debtor-in-possession accounts as may be necessary to facilitate the Debtor's chapter 11 case

and operations). The Debtor further requests authority to deposit funds in and withdraw funds

from any such accounts by all usual means including, but not limited to, checks, wire transfers,

ACH transfers, electronic funds transactions and other debits, and to treat the Debtor's Bank Account for all purposes as a debtor-in-possession account.

50.     In addition, the Debtor seeks a waiver of the requirement to establish specific bank accounts for tax payments. The Debtor believes tax obligations can be paid most efficiently out of the existing Bank Account, that the U.S. Trustee can adequately monitor the flow of funds in and out of the Bank Account, and that the creation of new debtor-in-possession accounts designed solely for tax obligations would be unnecessary and inefficient.

51.     Further, to minimize administrative expense and delay, the Debtor requests authority to continue to use its correspondence and business forms, including, but not limited to, purchase orders, letterhead, envelopes, promotional materials and other business forms (collectively, the "**Business Forms**"), substantially in the forms existing immediately prior to the Petition Date, without reference to the Debtor's status as debtor-in-possession.

52.     The Debtor purchases pre-stock checks. The Debtor currently has in hand several weeks of pre-stock checks. The Debtor seeks permission to exhaust the existing pre-stock checks to minimize administrative expenses. The Debtor, therefore, seeks authority to issue checks in accordance with past practices without reference to their debtor-in-possession status until these adjustments can be made.

53.     If the Debtor is not permitted to maintain its existing Bank Account the resultant prejudice will include delay in the administration of the Debtor's estate and costs to the estate to set up a new system, open new accounts, and print new business forms.

54.     I believe, therefore, that the relief requested is necessary and appropriate and is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest.

15

**Debtor-in-Possession Financing**

**The DIP Financing Motion**

55.     The Debtor has determined that a postpetition credit facility that permits it to

obtain new funds is necessary for the Debtor to continue to operate its business in Chapter 11

and to administer this Chapter 11 estate.

56.     The material terms of the proposed DIP Financing are as follows:

(a)     <u>Borrower.</u> Solution Technology International, Inc. *See* DIP Financing
Agreement introduction and § 1.5.

(b)     <u>Lender.</u> Resurgence Partners, LLC. *See* DIP Financing Agreement
introduction and §1.22.

(c)     <u>Commitment.</u> $783,000. *See* DIP Financing Agreement § 2.1

(d)     <u>Term.</u> The Obligations shall either be (i) due and payable in the event that
Borrower's plan of reorganization is confirmed by the Court, then automatically
converted into 92.5% of the Borrower's issued and outstanding common stock or
(ii) in the event that the Borrower's plan of reorganization is not confirmed by the
Court, paid from the assets of the Borrower or the proceeds of the disposition
thereof by the Borrower to Lender upon the earliest of the following (i) May 1,
2009 or (iii)  the date of acceleration of the Obligations upon the occurrence of an
Event of Default. *See* DIP Financing Agreement §2.3.

(e)     <u>Purpose.</u> The Debtor will utilize the proceeds of the financing to fund the
continuation of the operation of its business in accordance with the Budget in an
effort to manage, preserve and maximize the value of the assets of the Debtor's
bankruptcy estate. See Interim Order § 5(iv).

(f)     <u>Priority and Liens.</u> The prepetition and postpetition liens and security
interests of the Lender granted under the Secured Financing Agreements, the DIP
Financing Agreement and the Interim DIP Order in the Lender's collateral are
first and senior in priority to all other interests and liens of every kind, nature and
description, whether created consensually, by an order of the Court or otherwise,
including, without limitation, liens or interests granted in favor of third parties in
conjunction with Sections 363, 364 or any other Section of the Bankruptcy Code
or other applicable law. *See* DIP Financing Agreement § 4.1; Interim Order §
II(2).

16

(g)     Use of Cash Collateral. Resurgence Partners consents to the use of its cash collateral under the Interim DIP Order with the adequate protection set forth in Section 5(vii) of the Interim DIP Order.


(h)     Adequate Protection.  To the extent the Lender's liens on and security interests in the their collateral or any other form of adequate protection of the Lender's interests is insufficient to pay in full all obligations, the Lender shall also have the priority in payment afforded by Section 507(b) to the extent of any such deficiency. *See* Interim Order § II(8).

(i)     Carve-Out. The DIP Financing Agreement creates a carve out in the amount of $150,000 for payment of statutory fees to the U.S. Trustee, fees payable to the Clerk of the Court, and the allowed fees and expenses of attorneys, accountants and other professionals retained by the Debtor and any Committee(s) under Section 327 or 1103(a) of the Bankruptcy Code (the "Professional Fee Carve Out").  The Professional Fee Carve Out expressly excludes any fees and/or expenses incurred by any professional in connection with, among other things, the assertion (but excluding any investigation into) of any claim challenging the legality, validity, priority, perfection, or enforceability of the Lender's liens on and security interests in the Debtor's assets. *See* Interim DIP Order §§ II(5)-(7).


(j)     Interest. The Debtor's obligations under the DIP Financing Agreement shall bear interest at the per annum rate of 8%. *See* DIP Financing Agreement § 1.19.


(k)     Events of Default. Under the Interim DIP Order the Events of Default are those Events of Defaults pursuant to the underlying loan documents among the parties, any breach of the Debtor's obligations under the Interim DIP Order, and specific Events of Defaults added by the DIP Financing Agreement as follows:

    i.          The Borrower fails to pay the Loans on the Maturity Date (whether by acceleration or otherwise) or any other Obligation when due;

    ii.         The Borrower breaches, defaults, or fails or neglects to perform, keep or observe any covenant or provision of the DIP Financing Agreement, the Note, or any other Post-Petition Loan Document, and the same shall remain unremedied or unwaived for a period ending on the first to occur of (i) three (3) Business Days after the Borrower receives written notice from the Lender or (ii) ten (10) days after the Borrower first becomes aware thereof;

iii. The Borrower's expenses for any particular Budget Month exceed the amount set forth in the Budget by more than the Permitted Variance for the relevant week;

iv. Any representation, warranty, certification or statement made by the Borrower in the DIP Financing Agreement, any Post-Petition Loan Document, or any document to which the Borrower and the Lender are parties or by the Borrower in any certificate, financial statement or other document delivered pursuant hereto or thereto proves to have been incorrect in any material respect when made;

v. The DIP Financing Agreement shall cease to be effective to grant a perfected security interest in the Post-Petition Collateral with the priority stated to be created thereby or such security interest shall cease to be in full force and effect or shall be declared null or void, or the validity or enforceability of such security interest or this Agreement shall be contested by the Borrower;

vi. The Borrower, by motion, adversary action or other means, challenges or disputes in any manner, the nature, extent or validity of the Borrower's Lien on the Post-Petition Collateral;

vii. If the Borrower breaches or violates any term of the Final Order;

viii. Dismissal of the Chapter 11 Case, or conversion of the Chapter 11 Case to a case under Chapter 7 of the Bankruptcy Code;

ix. Appointment of a Chapter 11 trustee in the Chapter 11 Case;

x. The Borrower fails to file the Reorganization Plan (as defined in the Term Sheet) and accompanying disclosure statement on or before December 31, 2008;

xi. The Bankruptcy Court does not enter an order confirming the Reorganization Plan on or before May 1, 2009.

*See* DIP Financing Agreement § 10.1; Interim Order § III(1). *The Debtor anticipates that some of the Events of Default enumerated under the underlying prepetition loan agreements will be eliminated or waived as Events of Default in the final version of the proposed Interim DIP Order that will be presented to the Court.*

(l) <u>Waiver of Applicable Nonbankruptcy Law Relating to Perfection on Property of the Estate or on the Foreclosure or Other Enforcement of Liens</u>.  The Interim DIP Order is deemed to be sufficient and conclusive evidence of the priority, perfection, and validity of the post-petition liens and security interests

granted therein, effective as of the Petition Date, without any further act and
without regard to any other federal, state, or local requirements or law requiring
notice, filing, registration, recording or possession of the subject collateral, or
other act to validate or perfect such security interest or lien. *See* Interim Order
§ II(3).

   (m)    Relief From Automatic Stay. The automatic stay provisions of
Section 362 of the Bankruptcy Code are modified and vacated to the extent
necessary to permit the Lender to perform any act authorized or permitted under
the Interim DIP Order and the DIP Financing Agreement, including, without
limitation, (a) to implement the postpetition financing, (b) to take any act to
create, validate, evidence, attach or perfect any lien, security interest, right or
claim in the Lender's collateral, and (c) to assess, charge, collect, advance, deduct
and receive payments with respect to the DIP Financing Agreement including all
interests, fees, costs and expenses permitted under the DIP Financing Agreement,
and apply such payments to the Debtor's obligations under the DIP Financing
Agreement and the Interim DIP Order. Additionally, upon the occurrence of an
Event of Default and after providing five (5) business days prior written to
counsel for the Debtor, counsel for the Committee (if appointed), and the U.S.
Trustee, the Lender shall be entitled to take any action and exercise all rights and
remedies provided to them by the Interim DIP Order, the DIP Financing
Agreement and/or applicable law as such parties may deem appropriate in their
sole discretion to, among other things, proceed against and realize upon the
Lender's collateral. *See* Interim Order § III(3).

   (n)    Waiver of Section 506(c) Surcharge. No costs or expenses of
administration which have or may be incurred in the Bankruptcy Case at any time
during the period commencing on the date of the Interim DIP Order through and
including the date of the final hearing on the Motion (the "Interim Financing
Period") or any time after the expiration of the Interim Financing Period shall be
charged against the Lender, its respective claims, or its respective collateral
pursuant to Section 506(c) of the Bankruptcy Code without the prior written
consent of such Lender. *See* Interim DIP Order § III(5).

57.    Approval of the DIP Financing will provide the Debtor with immediate and

ongoing access to borrowing availability to pay its current and ongoing operating expenses,

including postpetition wages and salaries and other costs. Unless these expenses are paid, the

Debtor will be forced to immediately cease operations, which would likely (i) result in

irreparable harm to its business, (ii) deplete going concern value, and (iii) jeopardize the

Debtor's ability to maximize the value of its estate. The credit provided under the DIP

Financing will enable the Debtor to continue to satisfy vendors, service its customers, pay its employees, and operate its business in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of its estate for the benefit of all stakeholders. The availability of credit under the DIP Financing will provide confidence to the Debtor's creditors that will enable and encourage them to continue their relationships with the Debtor. Accordingly, the timely approval of the relief requested herein is imperative.

58.    The Debtor's liquidity needs can be satisfied only if the Debtor is immediately authorized to borrow under the DIP Financing Agreement and to use such proceeds to fund its operations. The Debtor has been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1), as an administrative expense under section 364(a) or (b), or in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1). The Debtor has not been able to obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein. Moreover, potential sources of the proposed DIP Financing for the Debtor, obtainable on an expedited basis and on reasonable terms, were extremely limited.

59.    The terms and conditions of the DIP Financing Agreement are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arms' length.

60.    As security for the DIP Financing, the Debtor proposes to grant to Resurgence Partners valid and perfected liens and security interests senior to any and all claims with respect to assets of the Debtor as of the Petition Date (the "**DIP Liens**").

61.    In addition to the DIP Liens, the Debtor requests that all of the DIP Obligations be granted an allowed administrative expense claim (the "**Administrative Expense Claim**") with priority under Section 364(c)(1) of the Bankruptcy Code and otherwise, over all administrative expense claims, unsecured claims, and all other claims against the Debtor, now existing or hereafter arising, of any kind or nature whatsoever, which allowed claims shall be payable from and have recourse to all prepetition and postpetition property of the Debtor and all proceeds thereof.

62.    The granting of the DIP Liens and the Administrative Expense Claim were an express condition to the DIP Financing.  Without such protections, Resurgence Partners would not have been willing to make the DIP Loan.  Accordingly, the DIP Liens and the Administrative Expense Claim are necessary and appropriate pursuant to section 364 of the Bankruptcy Code.

63.    I believe, therefore, that the relief requested is necessary and appropriate and is in the best interests of the Debtor's estate, its creditors, and other parties-in-interest.

### Conclusion

64.    For the reasons stated herein and in each of the First Day Pleadings, the relief sought therein is in the best interests of the Debtor, its creditors and estate; and therefore, on behalf of the Debtor, I respectfully request that the First Day Pleadings be granted.

### Verification

Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct this 4th day of November, 2008.

Dan L. Jonson
President and Chief Executive Officer
Solution Technology International, Inc.

Vanessa S. Hayward
Notary Public, District of Columbia
My Commission Expires 10/31/2012

**SWORN TO AND SUBSCRIBED** before me, a Notary
Public for the State and County Aforesaid, on this 7 day
of _____, 2008.

Notary Public
Commission Expires: 11/31/2012

22